UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH ZARGARY,

                            Plaintiff,

     -against-                                     00 Civ. 897

                                              **MEMORANDUM OPINION AND ORDER**

THE CITY OF NEW YORK, et al.,

                            Defendants.

---

      Plaintiff Elizabeth Zargary brings this claim against defendant City of New York (the "City") under 42 U.S.C. § 1983 for violations of her rights under the First Amendment to the Constitution of the United States.[1] Plaintiff, an Orthodox Jew who at the time in question wore a headscarf as a religious matter, alleges that defendant had a custom or practice of briefly removing headgear from the heads of prisoners to permit the taking of identification photographs during admittance to the Rose M. Singer Correctional Facility ("Singer Correctional"). Plaintiff claims that this custom or practice violated her rights under the Free Exercise Clause of the First Amendment when she was admitted to Singer Correctional. On July 30, 2008, the Court conducted a one-day bench trial to decide the merits of plaintiff's claim.[2] This Memorandum Opinion and Order sets forth findings of fact and conclusions of law in accordance with Rule 52 of the Federal

---

[1] Originally, plaintiff brought additional claims against the City and various individual defendants for violations of her rights under the Fourth and Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), as well as for intentional infliction of emotional distress under New York Common law. On June 18, 2008, the Court dismissed these claims, as well as all claims against the individual defendants, on defendants' motion for summary judgment. (Order dated June 17, 2008.)

[2] The Court references the transcript of that bench trial as "Trial Tr. at __."

Rules of Civil Procedure.  For the reasons that follow, the Court grants judgment to the defendant.

## FINDINGS OF FACT

Beginning on the evening of August 5, 1999 and lasting into the morning of August 6, 1999, Ms. Elizabeth Zargary was admitted as a new inmate to Singer Correctional.  (Johnson Test., Trial Tr. at 4-5; Ross Test., Trial Tr. at 32-33.)  The admissions process for new inmates at Singer Correctional involves, among other things, recording the inmate's personal information, fingerprinting the inmate, taking the inmate's photograph for identification purposes, searching the inmate, and giving the inmate a shower.  (Johnson Test., Trial Tr. at 5; Parker Test., Trial Tr. at 52.)  Corrections Officer Yvonne Johnson conducted this process for Ms. Zargary under the supervision of Captain Paul Favours.  (Johnson Test., Trial Tr. at 5, 7, 22-23.)  A portion of Ms. Zargary's admissions process, including the taking of Ms. Zargary's photograph, was videotaped.[3]  (Trial Tr. at 16.)

The Court finds that it is policy at Singer Correctional to photograph inmates without hats or head coverings during the admissions process.  (Johnson Test., Trial Tr. at 17 ("Q:  Is it the policy of the New York City Department of Corrections to remove religious head coverings in these types of matters when a photograph is necessary?  A: Yes."); Ross Test., Trial Tr. at 39-40.)  The photograph or photographs are placed on identification cards used by both the inmates and corrections officers.  (Ross Test., Trial Tr. at 40, 43, 45-46.)  Inmates must present their cards to move about the facility, and corrections officers keep two copies of the cards at a central location in case of inmate transfer, escape, or other circumstance where positive identification is necessary.  (*Id*.)

---

[3] The Court references events as seen on the videotape as "Video at __."

The requirement that the photograph be taken without any head covering arises from the need for a picture of the inmate that does not readily change over time.  (*Id*. at 40, 46-47.) The example proffered by Singer Correctional's former deputy warden is that of an escapee: "You don't know if the inmate is going to take off the head covering, so you have to have a picture showing exactly what the inmate looked like."  (*Id*. at 46.)  Should an inmate's hair, and therefore her appearance, change over time, Singer Correctional's policy is to take new pictures of the inmate.  (*Id*. at 38-39.)

   On the evening of August 5, 1999, at approximately 11:20 p.m., Ms. Zargary arrived at Singer Correctional wearing a head scarf.  (Johnson Test., Trial Tr. at 6.) During the admissions process, and pursuant to Singer Correctional's policy, Officer Johnson attempted to photograph Ms. Zargary without her head scarf.  (*Id*. at 6-8.)  Ms. Zargary refused to remove her head scarf for religious reasons.  (*Id*.)  According to the tenets of Jewish law followed by Ms. Zargary, Jewish women who are married or have been married must keep their hair covered at all times except in the privacy of a bathroom or bathhouse.  (Opinion of Rabbi Moshe Wiener, at 1.)  It is particularly important that Jewish women do not expose their hair in the presence of men not in their immediate family.  (*Id*.)

   After informing her superior, Officer Johnson continued talking to Ms. Zargary in an attempt to persuade her to take off her head scarf.  (Johnson Test., Trial Tr. at 9.) Officer Johnson explained the reasons for removing the head scarf and the importance for doing so, but Ms. Zargary continued to refuse.  (*Id*. at 9-10.)  At approximately 3:30 a.m., Ms. Zargary requested the presence of a rabbi, and Officer Johnson passed the request on to Captain Favours before returning to her efforts.  (*Id*. at 13-15.)  No rabbi ever arrived

3

at the scene. Then-Assistant Deputy Warden Brenda Ross testified that if an inmate requested a rabbi and none was in the building, one would be requested from ministerial services outside of business hours only in case of an emergency, e.g., a seriously ill inmate. (Ross Test., Trial Tr. at 41-42.) At several points, Ms. Zargary agreed to remove her head scarf only to refuse right before the picture was to be taken. (*Id*. at 13.) This first occurred after Officer Johnson explained that the pictures of her without the head scarf would be held in the General Office for use only by the General Office staff. (*Id*. at 10.) It also occurred when, upon Ms. Zargary's request, all the male officers left the room. (*Id*. at 22-23.) In fact, Officer Johnson repeatedly tried to accommodate Ms. Zargary "until the morning hours" but ultimately could not convince her to remove her head scarf. (*Id*. at 23.)

Eventually, the decision was made to videotape Ms. Zargary's admissions process. The videotape begins with Ms. Zargary seated on the floor of a holding cell and a Captain Williams trying to convince her to remove her head scarf. (Video at 00:35.) Assistant Deputy Warden Ross had called in Captain Williams, a "very patient" officer with "a lot of interpersonal communication skill", to help. (Ross Test., Trial Tr. at 34.) Captain Williams and others spend an additional four minutes talking with Ms. Zargary on the videotape. (Video at 00:35-04:30.) Eventually, two corrections officers lift her to her feet, and Ms. Zargary walks with them to a back room to be photographed. (*Id*. at 04:30.) When Ms. Zargary is standing in front of the camera, a male officer gently lowers her head scarf to her neck and shoulders and the pictures are taken. (*Id*. at 07:00.) The video camera is then briefly turned off only to be turned on again moments later to show Ms. Zargary seated on the floor, visibly upset and banging her head against the

4

wall. (*Id*. at 07:20-07:50.) The scarf remained around Ms. Zargary's neck and shoulders for the remainder of the video. Ms. Zargary made no attempt to put it back on her head, and no corrections officer stopped her from doing so. Correction officers' subsequently searched Ms. Zargary's person and transported her to the showers as part of the admissions process.

## CONCLUSIONS OF LAW

Because the challenged regulation is penological and because plaintiff was an inmate when the regulation was applied to her, plaintiff's challenge under the Free Exercise clause "is judged 'under a reasonableness test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'" *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). As the Court has previously held, (*see* Tr. of Conference held June 17, 2008, at 34), because the events at issue in this case preceded the enactment of RLUIPA, application of that statute's standard would be incorrect as a matter of law. *See Cancel v. Mazzuca*, No. 01 Civ. 3129 (NRB), 2003 WL 1702011, at *6 (S.D.N.Y. Mar. 28, 2003) ("[The Court] find[s] that allowing plaintiff to assert a claim for monetary damages under RLUIPA against [defendant], [based on events preceding its enactment], would violate the 'traditional presumption' prohibiting retroactive application of statutes."); *see also Young v. Goord*, No. 01 Civ. 626 (JG), 2005 WL 562756, at *7 (E.D.N.Y. Mar. 10, 2005) ("Counsel further conceded that RLUIPA may not be applied to acts occurring before [the statute's enactment]."). In determining whether a challenged regulation is

5

reasonably related to legitimate penological interests, courts consider four factors: (1) whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; (2) whether prisoners have alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin*, 467 F.3d at 274 (citing *Turner v. Safley*, 482 U.S. 78, 90-91 (1978)).

The Court of Appeals considered a challenge similar to plaintiff's in *Fromer v. Scully*, 874 F.2d 69 (2d Cir. 1989). In *Fromer*, the court upheld the Department of Corrections's Policy of requiring inmates to be clean-shaven when initially photographed and permitting beards of only one inch while incarcerated. *Id*. at 70-71. The court first found a "logical, if not obvious, connection between beard length and ease of identification of facial features." *Id*. at 74. Turning to the second factor in the Supreme Court's analysis, the Court of Appeals found that the burdened right of the plaintiff—there the exercise of his Orthodox Jewish faith—was capable of multiple means of religious expression within the confines of prison policy, including, for example, eating kosher. *Id*. at 75. On the third and fourth factors, the court found that the plaintiff had simply failed to carry his burden. Plaintiff had provided no evidence that prison officials' proffered burden—the risk of misidentification and the expenditure of scarce resources to keep track of an inmate's appearance—was unsupported, or that his proffered alternative—continuous rephotographing—had only a *de minimis* adverse effect on penological interests. *Id*. at 76.

6

The Court concludes that the analysis in *Fromer* applies with equal validity here. Singer Correctional's requirement that an inmate's head be uncovered for less than 10 seconds so that she can be photographed has a rational connection to a legitimate governmental objective. Being able to accurately identify inmates is clearly essential to maintain security at correctional facilities. *Id*. at 74. Without institutional memory of an inmate's appearance, corrections officers who had never seen the inmate would be unable to identify her if she were new to the facility, a transferee, or an escapee. (*See* Ross Test., Trial Tr. at 46.) Requiring that the inmate's head be uncovered in the photograph is certainly rationally related to this objective. *See Fromer*, 874 F.2d at 76. If an inmate's habit is to wear a hat or headdress, she could change her appearance, perhaps dramatically, in an instant by removing that hat or headdress. While there are certainly other ways for an inmate to change her facial appearance, this fact does not render Singer Correctional's policy irrational or invalid.

Turning to the other factors, it is unquestioned that, like the plaintiff in *Fromer* who also practiced the Orthodox Jewish faith, Ms. Zargary had other means to express her religious beliefs while incarcerated. *See id*. at 75. The burden imposed on Singer Correctional appears to be exposure to a risk similar to that in *Fromer* and plaintiff has provided no evidence that this risk is exaggerated. Finally, the alternative proposed by plaintiff—simply not requiring the removal of hats and headdresses for photographs—cannot be said to impose only a *de minimis* adverse effect on Singer Correctional's interests because it does nothing to minimize the risk of failing to identify inmates. Indeed, Officer Johnson and her fellow corrections officers tried to accommodate Ms. Zargary in multiple ways during the actual admissions process, minimizing in every way

7

possible the number of male officers that would ever see Ms. Zargary's head uncovered. Ultimately, however, Singer Correctional's interests could not be accommodated without a photograph of plaintiff's uncovered head and such a result was in direct conflict with plaintiff's interests.

      For this reason, the Court concludes that the facts here are distinguishable from those in *Benjamin v. Coughlin*, 905 F.2d 571 (2d Cir. 1990), which held that cutting an inmate's hair for a photo ID violated the Free Exercise Clause.  In *Benjamin*, the plaintiff was a member of the Rastafarian Movement, a religion that proscribes the cutting of a man's hair.  Because prison officials' only problem with the plaintiff's hair was that it covered his face, there was a simple alternative that accommodated the interests of all parties:  pulling the inmate's hair back in a pony tail to reveal his facial features.  Here, there was no way to partially remove or "pull back" plaintiff's headdress that would have accommodated both plaintiff and Singer Correctional's interests.  Further, while hair might take some time to grow back, the removal of plaintiff's headdress was necessary here for only a few seconds.  At no point did corrections officers stop Ms. Zargary from putting her headdress back on her head after the photographs were taken.  Weighing the four factors, the Court holds that, at least as applied to Ms. Zargary, Singer Correctional's policy of removing headdresses for the taking of photo ID pictures does not violate the Free Exercise Clause.

## CONCLUSION

For the reasons given, plaintiff has failed to prove that her rights were violated under Free Exercise Clause. The Clerk of the Court is directed to enter judgment for the defendant and close this case.

SO ORDERED

Dated: New York, New York
April 20, 2009

Richard J. Holwell
United States District Judge